James E. Cecchi
Donald A. Ecklund
CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

*Attorneys for Plaintiff*

*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| INDIANA/KENTUCKY/OHIO REGIONAL COUNCIL OF CARPENTERS WELFARE FUND, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| ELI LILLY AND COMPANY; NOVO NORDISK INC.; and SANOFI-AVENTIS U.S. LLC | |
| Defendants. | |

Plaintiff, the Indiana/Kentucky/Ohio Regional Council of Carpenters Welfare Fund ("Plaintiff"), on behalf of itself and all others similarly situated, for its Complaint against Defendants Eli Lilly and Company ("Eli Lilly"), Novo Nordisk Inc. ("Novo Nordisk"), and Sanofi-Aventis U.S. LLC ("Sanofi") (collectively, the "Defendants"), alleges the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I. INTRODUCTION

1. Plaintiff, a multiemployer, Taft-Hartley, self-insured group health plan, brings this proposed class action against the three primary drug manufacturers of analog insulin—Eli Lilly, Novo Nordisk, and Sanofi—for the artificial, deceptive, and unfair manipulation of the list prices for analog insulin in the United States. The insulin medications at issue in this Complaint are Humalog, Basaglar, Fiasp, Novolog, Levemir, Tresiba, Apidra, Lantus, and Toujeo (the "Analog Insulins").

2. The insulin market should be extremely competitive. Analog insulins have existed for decades, and they cost very little to produce. The Analog Insulins, which are produced and sold by the Defendants, are largely interchangeable. Accordingly, patients generally do not need to take one specific brand of insulin over the other to treat their diabetes, and health plans largely do not need to cover all of the Analog Insulins. Such market conditions should yield lower insulin costs for health plans and diabetics. But, because of Defendants' pricing scheme, described below, such competition has not occurred.

3. Drugs sold in the pharmaceutical industry can have many prices throughout the supply chain. The price set by the manufacturer—the *list price* (also known as the wholesale acquisition cost or "WAC")—provides the basis for all prices set in the distribution chain. The Defendants employed a scheme to widen the spread between the publicly available list price and another, secret price, the *net price*—or the price after subtracting rebates and discounts that the

Defendants offered to the large pharmacy benefit managers ("PBMs") that control the vast majority of the prescription drug market.

4.     PBMs represent health plans and act as third-party intermediaries when dealing with the drug manufacturers. In this role, PBMs create and maintain a list of drugs—called a formulary—that outlines the prescription medications the health plan will cover.

5.     When two or more branded medicines fall into the same therapeutic category and have similar effectiveness and safety profiles (as is the case with the Analog Insulins), a PBM may sometimes exclude, or place in a non-preferred position, one of the medications in favor of another. When a drug is excluded from formulary or placed in a non-preferred position, plan beneficiaries shoulder a greater percentage or all the disadvantaged product's cost.  Drug manufacturer like the Defendants profit when the PBMs place their drugs on their formularies in preferred positions.  To win such favorable treatment for their branded Analog Insulins, Defendants learn to game the PBM price structure to their own advantage.

6.     PBMs typically make money in two ways.  First, they keep the difference between what they pay pharmacies for drugs (a percentage of the list price plus dispensing costs) and what insurers pay them (a higher percentage of the list price plus dispensing costs).  Second, PBMs retain a portion of the difference between a drug's list price and the net price they negotiate with its manufacturer— i.e., the "spread" between prices. PBMs thus benefit both from higher list prices and larger spreads between list and net price. In theory, this pricing system supplies PBMs modest commissions on drug sales while incentivizing them to negotiate cost-saving rebates for the health benefits providers with which they work.  In practice, Defendants have learned to exploit this pricing system in a manner that turns what would be normal economic competition on its head.

7.      Specifically, the Defendants have engaged in "shadow pricing," a tactic where they tacitly agree to follow each other's list price increases in near unison.  Then, with identical list prices, the Defendants need only 'compete' by exploiting idiosyncrasies in the PBMs' incentive structures.  In other words, instead of lowering their *net* prices while keeping their *list* prices constant, the Defendants all raised their *list* prices in lockstep while keeping their *net* prices constant, as depicted below.



**Figure 1: Defendants increase rapid-acting insulin list prices in lock-step**

**Figure 2: Defendants increase long-acting insulin list prices in lock-step**



8.     This perverse form of competition has yielded absurd results.  Many of the Analog Insulins have become older; more alternatives have emerged; and market conditions have become more competitive--yet the Defendants' insulins have become *more* expensive, not less. In recent years, to prop up their net price in the competitive landscape, Defendants have resorted to aggressive list price increases, in lockstep, to make room for more rebates to the PBMs. In a five-year period alone, Eli Lilly, Novo Nordisk, and Sanofi raised their list prices by over 150%.  List prices that used to be $75 fifteen years ago are now between $300 and $700, and *nothing* about the Analog Insulins has changed in that period; the $600 drug is the exact same one the Defendants sold for $75 years ago.

9. Thus, the list prices for the Analog Insulins have become meaningless and divorced from net price. They do not reflect marketplace value for the products or cutting-edge technology, nor do they reflect some increasing need to recoup investment. Rather, to the extent they are not completely arbitrary, they simply reflect the lengths to which the drug manufacturers have gone to avoid market forces and exploit the incentive structures of the PBMs.

10. But while this pricing scheme benefits Defendants, it harms health plans and patients. Health plans must reimburse pharmacies for their plan members' insulin purchases at a set rate *tethered to the list price* that the Defendants hike in unison. So, by creating a system where all of the competing products bear equally high list prices, Defendants have foisted the financial consequences of this perverse form of competition onto the very parties that should benefit from it.

11. Defendants will point out that health plans often receive a portion of the rebates that the Defendants provide to PBMs, arguably mitigating the financial harm stemming from the higher list prices. But such a claim misunderstands the problem. Plaintiff, like the Class members it represents, receives and received rebates on a lump sum basis across all the drugs it purchases from a given pharmaceutical company (it does not receive individual rebates on specific drugs). Consequently, Plaintiff and like Class members have no way of ascertaining the true net prices of the Analog Insulins. This lack of transparency results in two harms.

12. First, the lack of transparency obfuscates the difference between list and net prices such that the health plans, including Plaintiff, cannot ascertain whether the prices they pay for the Analog Insulins are fair and competitive.

13.     Second, this opaque dual pricing system has misled the plans into believing they are receiving a better deal on the Analog Insulins than they are actually receiving.  The Defendants have told health plans, like Plaintiff here, that they are benefitting from a system of high list prices and rebates—that the health plans are obtaining lower prices for the Analog Insulins than they would absent the rebates.  This narrative is wrong. If Defendants were required to publish a list price that approximated the true net prices, Defendants would have to start competing through significantly lower net prices, rather than significantly inflated list prices.  Despite selling interchangeable products, Defendants have managed to escape the usual consequence of competition: lower prices. Their list price manipulation has enabled them to keep their net prices the same for decades, despite stiff competition. Clear, transparent pricing would force Defendants to compete on, and therefore lower, net price, benefiting both Plaintiff and consumers.

14.     All of the Defendants have participated in this arms-race escalation of reported list prices and spreads. What's more, they admit it.[1]

15.     Olivier Brandicourt, the former-CEO of Sanofi, acknowledged the growing gap between list price and net price in sworn testimony before the United States Senate Finance Committee:

> Since 2012, the net price of Sanofi insulins has declined 25 percent. Yet patient out of pocket costs have continued to rise. If you take Lantus, for instance, our most prescribed insulin, the net price has fallen by 30 percent since 2012. Yet over the same period, average out-of-pocket costs have risen approximately 60 percent for patients with commercial insurance and Medicare. It is my belief that declining net prices should result in lower out-of-pocket costs for patients. But clearly this is not always the case.[2]

---

[1]     U.S. Senate Finance Comm., Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug (Staff Rept. 2021), at 66 n.344.

[2]     Drug Pricing in America:  A Prescription for Change, Part II, Hearing before the Committee on Finance United States Sendate (Feb. 26, 2019), at 16.

16.     In written remarks in connection with an April 10, 2019 U.S. House of Representatives Committee on Energy and Commerce hearing, Doug Langa, Novo Nordisk's President, similarly recognized "misaligned incentives" that have led to higher drug costs, including for insulin: "Chief among these misaligned incentives is the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of WAC [list] price.  That means a pharmaceutical company fighting to remain on formulary is constrained from lowering WAC price, or even keeping the price constant, if a competitor takes an increase.  This is because PBMs will then earn less in rebates and potentially choose to place a competitor's higher-priced product on their formulary to the exclusion of others."

17.     Defendants indeed have a long history of having to defend deceptive pricing. In a similar case from nearly 20 years ago, defendant drug manufacturers "repeatedly asserted that they had no duty to disclose what was publicly known to everyone, that is, that the [drug's list price] was a 'sticker price' and never intended to reflect the drug's true average wholesale price."[3] But the district court saw through this argument: "There is a difference between a sticker price and a sucker price. . . . The [plaintiffs] . . . have it exactly right: '[I]f everything [about the drug] was known to everybody, why did [d]efendants emphasize secrecy?'"[4] As the court explained, the "defendants trumpeted a lie by publishing the inflated [list prices], knowing (*and intending*) them to be used as instruments of fraud."[5]

18.     In this case, Defendants knew that the list prices for the Analog Insulins served as the basis for health plan payments.  But, the Defendants still published artificially inflated list

---

[3]     *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 168 n.19 (D. Mass. 2003).

[4]     *Id.*

[5]     *Id.* at 167.

prices for the Analog Insulins in a scheme that unfairly deprived health plans and patients the benefits of competition. This constitutes an unfair and unconscionable practice.

19.     Defendants' actions harm the Class that Plaintiff seeks to represent health plans who pay and/or reimburse pharmacies and PBMs that maintain mail-order pharmacies for Analog Insulin purchases based on the drugs' list prices.  Plaintiff, like the proposed class it represents, offers health benefits to insulin-dependent participants.  One of the key benefits it provides to its participants is coverage of their drug costs.  When a participant goes into a pharmacy to purchase an insulin, her health plan pays for a sizable portion of that prescription, and the health plans, like Plaintiff here, pay for that prescription based on *list* price.  This formula is set out in contracts between the health plan Class member and the pharmacy or PBM.  Thus, Plaintiff and the proposed Class members' purchases, at the point of sale, are based on the Defendants' list prices.  The price reductions the Defendants offer the PBMs *are not reflected* in the negotiated rates Plaintiff is charged for their covered participants' purchases.  Thus, the larger the list price, the larger the amount Plaintiff is charged.  Each of the Defendants were aware of the impact the list price increases, for the Analog Insulins, had on health insurer payments to pharmacies.

20.     The Defendants publicly represent that the list prices of the Analog Insulins are just that, *list* prices—a fair representation of the product's value in the market and a reasonable basis for consumer and health plan payments.  So, when they inflate their list prices to arbitrary levels, solely to provide increased rebates in exchange for formulary access, they mislead Plaintiff and Class members and unfairly force them to reimburse pharmacies for their Analog Insulins at grossly inflated rates.

21.     As a result of Defendants' conduct, Plaintiff and Class members overpaid for the relevant insulins when they paid for these medications based on their list prices.  The amount they

overpaid is the difference between their share of the list price, inflated by the pricing scheme, and the percentage of that share that reasonably tracked the drug's true net price.

22.     This action alleges that Defendants violated various state consumer protection laws by engaging in a deceptive and unfair pricing scheme with respect to the Analog Insulins. This scheme directly and foreseeably caused, and continues to cause, health plans and third-party payors to overpay for the Analog Insulins their insured members need.

## II.    PARTIES

### A.    Plaintiff

23.     The Indiana/Kentucky/Ohio Regional Council of Carpenters Welfare Fund, or IKORCC, is a multiemployer, Taft-Hartley, collectively bargained group health plan. IKORCC has over 35,000 professional tradespeople in 36 locals in Indiana, Kentucky and Ohio. The IKORCC is headquartered, with its principal place of business, in Troy, Michigan. Plaintiff provides self-insured medical and prescription drug benefits to its Participants. During the Class Period, Plaintiff paid for certain of the Analog Insulins based on the artificially inflated list prices. Plaintiff will continue to purchase the Analog Insulins in the future. As a result, Plaintiff has been injured.

### B.    Defendants

24.     Defendant Eli Lilly and Company is a corporation organized and existing under the laws of the State of Indiana. Eli Lilly's principal place of business is Lilly Corporate Center, Indianapolis, Indiana 46285. Eli Lilly manufactures Humalog and Basaglar, which are used for the treatment of diabetes. Eli Lilly's revenues from Humalog were $2.06 billion in 2022 and $2.45 billion in 2021.

25.     Defendant Novo Nordisk Inc. is a Delaware corporation and has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536. Novo Nordisk

manufactures Fiasp, Novolog, Levemir, and Tresiba, which are used for the treatment of diabetes. Novo Nordisk's net sales of all its insulin products totaled 38.76 billion Danish kroner (or approximately $5.61 billion) in 2022 and 39.94 billion Danish kroner (or approximately $5.78 billion) in 2021.

26.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.  Sanofi manufactures Apidra, Lantus, and Toujeo, which are used for the treatment of diabetes.  Sanofi's net sales from Lantus were €2.25 billion (approximately $2.44 billion) in 2022 and €2.49 billion (approximately $2.7 billion) in 2021.  Sanofi's SEC Form 20-F for the year 2022 notes that "Lantus is particularly important; it was one of Sanofi's leading products in 2022 . . . ."

27.

## III.    JURISDICTION AND VENUE

28.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant. Finally, this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

29.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in the District of New Jersey, and because some of the actions giving rise to this Complaint took place within this district.

30.     The Court has personal jurisdiction over each Defendant.  Each Defendant has transacted business, maintained substantial contacts, and/or committed the alleged pricing scheme throughout the United States, including in this District.  Defendants' unfair and unlawful conduct

has been directed at, and has had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the United States, including in this District.

## IV.    DRUG PRICING IN THE UNITED STATES

### A.    Entities Involved in Drug Pricing

31.    The prescription drug industry consists of a network of entities, including pharmaceutical companies, wholesalers, pharmacies, health benefit providers (institutional insurers, self-insured employers, health and welfare plans), PBMs, and patient-consumers.

32.    *Pharmaceutical Companies*. Pharmaceutical companies (also known as drug companies or drug manufacturers) own the rights to manufacture and market drugs.  This remains true even if these companies contract out the actual production of their drugs.  Pharmaceutical companies typically own or contract with facilities that manufacture drugs and then sell their products to wholesalers.  Critically, pharmaceutical companies set the prices of their drugs and then those prices are used to calculate payments consumers and health plans pay for and/or make at the pharmacy at the point of sale.  The Defendants here are pharmaceutical companies.

33.    *Wholesalers*. After production, the Defendants send their drugs to FDA-registered drug wholesalers for further distribution.  Wholesalers purchase inventory and sell pharmaceutical products to a variety of providers, including retail pharmacy outlets, hospitals, and clinics.

34.    *Retail Pharmacies.* Retail pharmacies purchase drugs from the wholesalers.  They then sell these drugs to consumers.  When a retail pharmacy (a pharmacy with a physical location) sells a drug to a consumer, it looks up whether or not that consumer holds health insurance and then charges the consumer a price depending on his or her insurance status. Consumers with insurance are usually only responsible for paying a portion of the drug's cost, with the health plan picking up the remainder of the bill.

35.    ***Health benefit providers***. Health benefit providers include institutional insurers, self-insured employers, and health and welfare plans. These plans submit payments on behalf of insured individuals to healthcare providers for services rendered to those individuals. Health insurers also cover a portion of their beneficiaries' drugs costs, submitting payments to pharmacies on behalf of their members. The term "health insurers" includes public and private entities, the latter of which includes self-insured businesses, insurance companies, union-run health plans, and private plans that sponsor Medicaid and Medicare drug benefits. Plaintiff and the proposed Class are self-insured health benefit providers who bear the risk and cost of their members' purchases.

36.    ***Pharmacy Benefit Managers***. PBMs effectuate financial and contractual arrangements between drug manufacturers, pharmacies, and health insurers. In this role, PBMs perform a variety of services on behalf of their health insurer clients, including the negotiation of rebates with drug companies, creation of formularies, management of prescription billing, setting the prices in coordination with manufacturers that payors will pay for prescription drugs, construction of retail pharmacy networks for insurers, and provision of mail-order services. Nonetheless, they generally are not a direct link in the physical supply chain for pharmaceutical products because, in most instances, they do not take possession or control of prescription drugs. Just three PBMs—CVS Caremark, Express Scripts and OptumRx—including their affiliates, cover roughly 80 to 85 percent of privately insured Americans.

37.    There is one exception to this general rule. PBMs sometimes run their own mail-order pharmacies where consumers can buy drugs directly from the PBMs and have those drugs shipped to them. For example, many diabetes patients purchase Analog Insulin through PBMs' mail-order pharmacies. Where PBMs run their own mail-order pharmacies, they do take

possession of the drugs available for purchase in their mail-order pharmacies.  In this situation, consumers and health plans, including Plaintiff, buy directly from the PBM.

### B. The Drug Payment & Distribution Structure

38. ***Distribution***.  Generally speaking, for retail pharmacy channels, branded prescription drugs are distributed from manufacturer to wholesaler, wholesaler to retail pharmacy (or mail order), and retailer to patient.

39. ***Downstream charges***.  The downstream charges are from manufacturer to wholesaler, wholesaler to retailer (or mail order), and retailer (or mail order) to the health benefit providers (in the form of reimbursement and dispensing fees) and consumers (in the form of coinsurance, copayment, deductible payment, and/or cash).

40. ***Upstream charges***.  The upstream charges are from PBMs directly back to the manufacturer.  These upstream charges are price discounts the Defendants offer PBMs in the form of "rebates."  They typically occur well after the point-of-sale transactions.

41. The figure below illustrates this payment structure.  This figure labels certain payments "payment" and others "negotiated payment."  The term "payment" refers to individual payments, made at the time of delivery; for example, when a patient walks into a pharmacy and picks up her prescription.  At that moment, her health plan—the Class here—also pays a service fee to its PBM for dispensing the drug through its network of retail pharmacies.  In contrast, a "negotiated payment" is a payment made under a negotiated contract.  For example, a PBM might negotiate a contract with a drug manufacturer for supply of X drug for $Y per pill for a period of time.  The figure also indicates the flow of products and rebates.

**Figure 3: The U.S. Drug Payment Structure[6]**



42.    When an insured consumer buys a medication from a pharmacy (a retailer), her insurer—the Class here—pays the pharmacy based on list price. Typically, they pay what's called the *average wholesale price* (or "AWP") minus some fixed percentage; and AWP itself is WAC (the list price set by the manufacturers) plus some fixed percentage. Importantly, the insurer's payment is based on the *list* price the drug manufacturer set for that drug.

**C.    The Defendants Have Ample Opportunity to Coordinate Pricing**

43.    Each Defendant is a member of the industry group Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely communicated via PhRMA meetings and platforms regarding the pricing of Analog Insulins.

44.    David Ricks (Eli Lilly's Chairman and CEO), Paul Hudson (Sanofi's CEO), and Douglas Langa (Novo Nordisk's President and EVP of North American Operations), serve on PhRMA's Board of Directors and/or as part of the PhRMA executive leadership team.

---

[6]    Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

45.     Defendants also routinely communicate through direct interaction with PBMs at trade associations, including the Pharmaceutical Care Management Association ("PCMA") and industry conferences. The Defendants are each affiliate members of PCMA.

46.     Each year, high-level representatives and corporate officers from the Defendants attend PCMA conferences to meet in person and engage in discussions, including those related to the prices of Analog Insulins.

47.     For at least the last eight years, all Defendants have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PBM conferences.  Many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications.

48.     Representatives from each Defendant have routinely met privately with representatives from each of the three largest PBMs during PCMA's Annual Meetings and Business Forum conferences each year.[7]

49.     In addition, all PCMA members, affiliates, and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."

50.     The Defendants have utilized PCMA meetings as opportunities to arrange lockstep price increases.

51.     For example, just days after Defendants had met at PCMA's annual meeting on September 26 and 27, 2017, on October 1, 2017, Sanofi increased Lantus's list price by 3% and

---

[7]     PCMA, *PCMA-Connect*, https://www.pcmanet.org/contact/pcma-connect/.

Toujeo's list price by 5.4%, while Novo Nordisk recommended that their company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.[8]

52.    Similarly, on May 30, 2014, a few weeks after PCMA's 2014 spring conference, Novo Nordisk raised the list price of Levemir a matter of hours after Sanofi made its list price increase on Lantus.[9]

**D.    Health Plans Reimburse Analog Insulin Purchases Based on AWP**

53.    A drug's list price—known as its Wholesale Acquisition Price (WAC) or the mathematically-related Average Wholesale Price (AWP) —is the starting point for drug payments in the pharmaceutical distribution system.  For this reason, it is publicly available and listed in compendia by drug price aggregators like First Data Bank.

54.    The use of drug list prices to calculate and communicate reimbursement payments was supposed to create an efficient system through which drug costs could be shared among the various purchasers—plans, consumers, and wholesalers.  The purpose of a centralized price was to maintain the system's flexibility, minimize uncertainty through predictable costs, maximize coverage in cost-effective manner, and provide a mechanism for competition among payors.

55.    Towards this end, health plans' reimbursement formulas are tied to AWP.  When a consumer goes to a retail pharmacy (or the website of a mail order pharmacy) and requests to buy a drug, the pharmacy's computer system pulls up AWP, which is the list price the manufacturer of that drug set and published, plus an approximately 15-20% markup.  The basis for that price is not determined by the pharmacy or the wholesaler that brought the drug to the pharmacy.  Rather, the

---

[8]    Charles E. Grassley, Ron Wyden, Staff Rep. of Comm. on Fin., 116th Cong., Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug 4 (Comm. Print 2021), https://www.finance.senate.gov/imo/media/doc/Insulin %20Committee%20Print.pdf.

[9]    *Id.* at 47.

pharmacy's computer system taps into a database of prices that manufacturers created and published through third party publishers. The pharmacy's search for the drug's price is akin to a stockbroker's search for the price of a stock; the pharmacy, like the broker, does not and cannot change or influence the list price.

56.     When a consumer purchases a branded insulin, the consumer pays her portion of the cost (whether that be a co-pay, a co-insurance payment, or deductible payment), and her insurer or health plan pays the other portion. The pharmacy reimbursement is set by a formula negotiated between the pharmacy and the health plan (or the health plan's PBM, on behalf of the health plan) and based on AWP/WAC.

57.     The price benchmarks (i.e., AWP or WAC) used in their formulas are commonly adjusted by a percentage that is contractually set. For example, health insurer reimbursement to a pharmacy for an insulin could be determined based on the lower of the drug's (i) AWP – $x\%$, (ii) WAC + $y\%$, and (iii) payment cap.

58.     Despite some modifications to reimbursement policies over time, the most commonly and continuously used set of reference prices in reimbursement payment calculations and negotiations for retail channel drug transactions remains AWP.

59.     From an administrative perspective, AWP provides—or at least used to provide— a logical starting point for the calculation and communication of reimbursement to various pharmacy providers for various drugs. And given the historical use of AWP by all industry participants, one cannot discount the significance of AWP's entrenchment in the complex and highly automated payment system that is used to process billions of payments. As such, it is widely used to estimate costs and revenues.

60.     The Defendants' list prices also serve as the immovable reference point from which PBMs and drug manufacturers negotiate rebates. As previously explained, PBMs create formularies for their health insurer clients, and those formularies significantly influence patients' drug purchasing behavior.  The Defendants offer PBMs rebates—discounts off list prices—to influence the PBMs' formulary decisions.

### E.    Defendants' Manipulation of PBM Incentives and Resulting Profits

61.     The pricing scheme at issue here affords the Defendants to win formulary placement for their Analog Insulins by paying the PBMs secret, but significant, rebates.

62.     This allows the Defendants to garner greater revenues from sales without decreasing their profit margins.  The Defendants also use the inflated price to earn hundreds of millions of dollars in additional tax breaks by basing their deductions for donated insulins on the inflated list price.

63.     PBMs make a profit in two primary ways relevant here: First, their health insurer clients pay them service fees for processing prescriptions and operating mail-order pharmacies. Second, PBMs take a cut of the drug price discounts they negotiate with drug companies (with the rest sometimes passed on to their health insurer clients).   The manufacturers' "rebate" arrangements are meant to create an incentive for PBMs to negotiate lower *real* drug prices.  But the Defendants know that this business model can be manipulated such that the PBMs no longer have an incentive to control costs.

64.     PBMs have the greatest leverage to negotiate lower prices when drugs are FDA-approved as bioequivalent or biosimilar, i.e., when a drug "goes generic."  But PBMs also have leverage when two or more drug companies manufacture drugs that, while not bioequivalent or biosimilar, are nevertheless in the same therapeutic class and are perceived to have similar efficacy

and risk profiles. That is the case with the Analog Insulins. In such a scenario, the drug companies should compete for formulary access by lowering their list prices.

65. But Defendants have found a way to game this system. As Defendants have realized, the spread between net and list price can be enlarged by *raising list prices* while holding *net prices constant* (or decreasing them slightly). Defendants know that when they increase the list prices of their insulins, the PBMs can earn substantially greater revenues so long as net prices remain constant.

66. The perverse incentives for larger list prices (and consequent health plan overpayments), was described in a recent report on the drug industry:

> At the whole-market level, we sense that the price protection rebate arbitrage game is driving manufacturers to higher list price increases than would otherwise occur, particularly on the eve of a general election. Price protection rebates between brand manufacturers and PBMs are common, as are fixed rebate agreements between PBMs and a significant portion of their plan sponsors. When brand manufacturers' [list price] increases exceed the price protection threshold, the manufacturers rebate the difference to PBMs, who pocket the difference when these price protection rebates grow faster than the PBMs' fixed rebate commitments to plan sponsors. Thus all else equal in a given category, the product with the more rapid list price increases is more profitable to the PBM. Manufacturers, realizing this, don't want their products disadvantaged, and accordingly are driven to keep their rates of list price inflation at least as high, and ideally just a bit higher, than peers'. Durable list price inflation is the natural result. Net price inflation is unaffected, but unit volumes suffer as higher list prices directly impact consumers who have not yet met their deductibles.[10]

67. Defendants here have used the phony list prices to their advantage. Indeed, as the District Court for the District of Massachusetts explained, rebates are really "direct kickbacks," disguised as market-share discounts and rebates."[11] This pricing scheme enables Defendants to maintain preferred formulary positions without reducing their net prices.

---

[10]    Richard Evans, Scott Hinds, & Ryan Baum, US Rx Net Pricing Trends Thru 2Q16, SSR LLC, 36 (Oct. 5, 2016).

[11]    *United States ex rel. Banigan v. Organon USA Inc.*, 2016 WL 6571269, at *1 (D. Mass. Jan. 20, 2016).

68.     The Defendants understand that PBMs make more money as prices increase.  As the U.S. Senate Finance Committee has explained:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price.[12]

69.     The Defendants also understand that because of the PBMs' market dominance, most payors, accept the baseline national formularies offered by the PBMs with respect to Analog Insulins.

70.     Over the past several years, Defendants have raised prices in unison and have paid correspondingly larger rebates and other price concessions to PBMs.  Predictably, the PBMs have granted the Defendants' diabetes medications preferred status on their formularies.  During the relevant period, the rebate amounts for Analog Insulins (as a proportion of the list price) grew year-over-year while list prices themselves increased.

71.     PBMs' contracts with payors like Plaintiff narrowly define "rebates" by tying them to patient drug utilization.  Thus, rebates for formulary placement (which are not tied to patient drug utilization) are characterized as "administrative fees" that are not remitted to payors.  Such payments are beyond a payor's contractual audit rights because those rights are limited to "rebate" payments and these "administrative fees" have been carved out from the definition of "rebates."

72.     A recent study by the Pew Charitable Trust estimated that between 2012 and 2016 the amount of administrative and other fees that the PBMs received from the Manufacturers tripled, reaching more than $16 billion.[13]  According to the study, although rebates were sent to payors

---

[12]     Charles E. Grassley & Ron Wyden, Staff Report on Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug, Sen. Fin. Comm., at 6, 54, 55 (Jan. 2021), https://www.finance.senate.gov/chairmans-news/grassley-wyden-release-insulin-investigation-uncovering-business-practices-between-drug-companies-and-pbms-that-keep-prices-high.

[13]     The Pew Charitable Trusts, *The Prescription Drug Landscape, Explored* (Mar. 8, 2019), https://www.pewtrusts.org/en/research-and-analysis/reports/2019/03/08/ the-prescription-drug-landscape-explored.

during this period, PBMs retained the same volume of rebates in dollar terms, due to the overall growth in rebate volume, while administrative fees and spread pricing further offset reductions in retained rebate volumes.

73.    Thus, the Defendants' gaming of the PBM incentive structure has caused and continues to cause precipitous price increases for Analog Insulins.

74.    The losers in this scheme are Analog Insulin consumers and the health plans who pay higher prices for the Analog Insulins used by their participants.  Defendants were well aware of the impact of their list prices on Plaintiff and Class members.

**F.    Defendants Downplay the Pricing Scheme for Analog Insulins and Its Resulting Harms to Congress**

75.    On April 10, 2019, the U.S. House of Representatives Committee on Energy and Commerce held a hearing on industry practices titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[14]

76.    Representatives from Defendants testified at the hearing and admitted that the price for insulin had increased exponentially over the past 15 years.  Representatives for Defendants also conceded that the price that diabetics pay out-of-pocket for insulin is too high.  For example:

a.    Mike Mason, Senior Vice President of Eli Lilly, testified when discussing how much diabetics pay out-of-pocket for insulin: "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications."[15]

b.    Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified: "Patients are rightfully angry about rising out-of-pocket costs for many medicines and we all have a responsibility to address a system that is

---

[14]    House Energy and Commerce Comm. Hearing on Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin, 116th Cong.(2019), *preliminary transcript,* https://www.congress.gov/116/meeting/house/109299/ documents/HHRG-116-IF02-Transcript-20190410.pdf (last visited Sept. 6, 2023) (hereinafter. "Priced Out of a Lifesaving Drug").

[15]    *Id*. at ¶¶461-63.

clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . [S]ince 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent . . ."[16]

c.    Doug Langa, Executive Vice President of Novo Nordisk, testified: "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the list prices of our medicines. We also know that list price matters to many, particularly those in a high-deductible health plan and those that are uninsured."[17]

77.    None of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased production costs or improved clinical benefit.

78.    Instead, the written testimony of Doug Langa, Novo Nordisk's President, recognized "misaligned incentives" that have led to higher drug costs, including for insulin: "Chief among these misaligned incentives is the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of WAC [list] price. That means a pharmaceutical company fighting to remain formulary is constrained from lowering WAC price, or even keeping the price constant, if a competitor takes an increase. This is because PBMs will then earn less in rebates and potentially choose to place a competitor's higher-priced product on their formulary to the exclusion of others."[18] Likewise, Mr. Langa's responses to questions for the record conceded that "[t]he disadvantage of a system in which administrative fees are paid as a percentage of list price is that there is increased pressure to keep list prices high. . . ."[19] The hearing transcript records Mr. Langa's further comments in this regard:

---

[16]    *Id.* at ¶¶616-18, 643-44, 657-59.

[17]    *Id.* at ¶¶531-35.

[18]    Testimony of Douglas J. Langa, Comm. on Energy and Commerce (Apr. 10, 2019) https://www.congress.gov/116/meeting/house/109299/witnesses/HHRG-116-IF02-Wstate-LangaD-20190410.pdf.

[19]    Questions for the Record Responses of Douglas J. Langa, Comm. on Energy and Commerce, Hearing on Priced Out of Lifesaving Drugs: Getting Answers on the Rising Cost of Insulin (Apr. 10, 2019), https://www.congress.gov/116/meeting/ house/109299/witnesses/HHRG-116-IF02-Bio-LangaD-20190410-U2.pdf.

So as you heard last week from Dr. Cefalu from the ADA [American Diabetes Association], there is this perverse incentive and misaligned incentives and this encouragement to keep list prices high. And we've been participating in that system because the higher the list price, the higher the rebate . . . There is a significant demand for rebates . . . we're spending almost $18 billion a year in rebates, discount, and fees, and we have people with insurance with diabetes that don't get the benefit of that. (emphasis added)[20]

79.    Eli Lilly admitted that it raises list prices as a quid pro quo for formulary positions.

At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly, testified:

Seventy-five percent of our list price is paid for rebates and discounts . . . $210 of a vial of Humalog is paid for discounts and rebates. . . We have to provide rebates [to PBMs] in order to provide and compete for that [formulary position] so people can use our insulin.[21]

In the very next question, Mr. Langa of Novo Nordisk was asked: "[H]ave you ever lowered a list price? His answer: "We have not."[22]

80.    Sanofi's Executive Vice President for External Affairs, Kathleen Tregoning, similarly testified:

The rebates is [sic] how the system has evolved . . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.[23]

81.    Her written response to questions for the record acknowledged that "it is clear that payments based on a percentage of list price result in a higher margin [for PBMs] for the higher list price product than for the lower list price product."[24]

---

[20]    Priced Out of a Lifesaving Drug, ¶¶ 987-91, 994, 1103-05

[21]    *Id*. at ¶¶979, 984-85, 1201-02.

[22]    *Id*. at ¶¶1203-05.

[23]    *Id*. at ¶¶1123, 2409-12.

[24]    Questions for the Record Responses of Kathleen Tregoning, Comm. on Energy and Commerce, Hearing on Priced Out of Lifesaving Drugs: Getting Answers on the Rising Cost of Insulin (Apr. 10, 2019), https://www.congress.gov/116/meeting    /house/109299/witnesses/HHRG-116-IF02-Bio-TregoningK-20190410-U2.pdf.

82.     Given the Defendants' claims that rebates were the sole reason for rising prices, each was asked directly during the Congressional hearing to guarantee it would decrease list prices if rebates were restricted or eliminated.  The spokespersons for Eli Lilly, Novo Nordisk, and Sanofi all said only that they would "consider it."[25]

## V.    ANALOG INSULIN

### A.    Diabetes: The Disease and Demographics

83.     Diabetes is an epidemic in the United States.  One in five health care dollars is spent caring for people with diagnosed diabetes.  Over 30 million people, 9.4% of the country, live with diabetes.  A life-threatening disease, many of those living with diabetes rely on daily insulin treatments to survive.  Interruptions to these regimes can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin.  Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States.  Missed or inadequate insulin therapy can leave diabetics with too little insulin in their system, triggering hyperglycemia and then diabetic ketoacidosis.  Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days.  Diabetic ketoacidosis is responsible for more than 500,000 hospital days per year at an estimated annual direct medical expense and indirect cost of $2.4 billion.[26]

84.     The number of Americans who live with diabetes has exploded in the last half century.  In 1958, only 1.6 million people in the United States had diabetes.  By the turn of the century, that number had grown to over 10 million.  Just 14 years later, the head count tripled again. Now over 30 million people—9.4% of the country—live with the disease.  And this trend

---

[25]      Priced Out of a Lifesaving Drug, ¶¶2068, 2070, 2077-79.

[26]      Abbas E. Kitabchi, et al., *Hyperglycemic Crises in Adult Patients with Diabetes*, 32 Diabetes Care 1335, 1335 (2009).

does not appear to be slowing: 86 million Americans have prediabetes, a health condition that significantly increases a person's risk of type 2 diabetes.

85.     Diabetes occurs when a person has too much glucose—sugar—in their blood stream.  Normally, the human body breaks down ingested food into glucose, which in turn feeds cells and enables them to function.  In this process, insulin functions as a key, opening the cells and permitting glucose to enter.  A lack of insulin or responsiveness to insulin causes the process to break down.  Glucose is unable to enter the cells, which leads to high blood sugar levels. Unchecked, high blood sugar levels in a non-diabetic can lead to type 2 diabetes.

86.     There are two basic types of diabetes.  Roughly 90-95% of Americans living with diabetes developed the disease because they do not produce enough insulin, or have become resistant to the insulin their bodies do produce.  Known as type 2, this more common form of diabetes is typically associated with increased body weight and is often developed later in life. When first diagnosed, many type 2 patients can initially be treated with tablets that help their bodies either secrete more insulin or better respond to the insulin they already produce. Nonetheless, these tablets are often insufficient for patients in the long term.  To adequately control their blood sugar levels, many type 2 patients must inject insulin to supplement that which their bodies produce.  About a quarter of type 2 patients rely on insulin treatment.

87.     Type 1 diabetes occurs when a patient completely ceases insulin production. This form of diabetes is usually diagnosed in children and young adults but can occur at any age. In contrast to type 2 patients, people with type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die.  Individuals living with type 1 must rely on insulin treatments from the point of diagnosis until death.

88.    If left untreated or under-treated, diabetes can become a debilitating and deadly disease.  Indeed, it remains the seventh leading cause of death in the United States, despite the availability of effective treatment.  People with diabetes are almost twice as likely to have heart disease or a heart attack and one and one-half times more likely to have a stroke as those without the disease.  Chronic kidney disease and failure is also much more common among those with diabetes.  Furthermore, diabetes damages blood vessels and nerves, leading to serious, hard-to-treat infections, and even amputations.  Finally, the disease is the leading cause of blindness.

89.    The explosion in diabetes prevalence has hit minorities and the poor the hardest. Type 2 diabetes disproportionately impacts African-Americans, American Indians, Asian Americans, Hispanics/Latinos, and Pacific Islanders. For example, Native Americans are 420% more likely to die from diabetes-related causes of death than other Americans.  With decreased access to nutritious food sources and fitness options, low-income individuals are at a greater risk of obesity and, correspondingly, diabetes.  These same demographic groups also account for a disproportionate share of the uninsured.

**B.    The Origins of Insulin Treatment**

90.    Despite its potentially deadly impact, diabetes is a highly treatable illness.  For patients who are able to follow a prescribed treatment plan consistently, the harmful symptoms and health complications associated with the disease are entirely avoidable.  And what's more, unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

91.    In 1922, two men pioneered a technique for removing active insulin from an animal pancreas that could then be used to treat human patients with diabetes.

92.     A "widely celebrated tale of biomedical serendipity,"[27] this breakthrough is revered for two reasons.  First, the duo that discovered how to extract insulin for patient treatment was an unlikely pair: a young orthopedic surgeon without laboratory training, Frederick Banting, and his medical-student assistant, Charles Best.  Second, neither Banting nor Best applied for a patent on their game-changing innovation because they wanted to ensure their discovery remained open to the public, available to all.  This decision offers a sad commentary on the state of the current pharmaceutical industry.

93.     Ironically, Banting and Best eventually ended up applying for a patent to guarantee access: Banting and Best realized that if they did not patent their drug, someone else would.  To prevent others from obtaining exclusive rights and restricting supply, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 each.  As they wrote to the University's president, the patent was a form of publication: "When the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[28]

94.     After selling their patent to the University of Toronto, university researchers attempted to manufacture insulin on campus.  However, they quickly realized they lacked the facilities necessary to meet the demand.  Therefore, to scale production, the University of Toronto teamed up with Eli Lilly, "an established pharmaceutical company with experience producing glandular extracts."[29]  Under this arrangement, Eli Lilly was allowed to apply for U.S. patents on any improvements to the manufacturing process.  In addition to their contract with Eli Lilly, the

---

[27]     Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

[28]     M. Bliss, The Discovery of Insulin (2013).

[29]     Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

Toronto team licensed the rights to produce insulin to a few other companies, including Denmark's Nordisk Insulin Laboratorium and Novo Terapeutisk Laboratorium.[30] Those initial licenses laid the groundwork for Eli Lilly and Nordisk's future domination over the sale of insulin products.

95.     Although the Toronto team's early iteration of insulin was immediately perceived as "a lifesaving drug of vast clinical public health significance,"[31] subsequent research led to further improvements in the drug's efficacy.  The original animal insulin isolated by the Toronto team was short acting—it only had an effect on patient blood sugar levels for three to six hours. In the early 1930s, scientists at Nordisk discovered that the addition of a certain protein to insulin altered its absorption into the blood stream, prolonging its effect.  This form of insulin became known as long-acting.  A subsequent innovation in 1946—the addition of zinc to form the crystalline protamine-isophane insulin, now known as neutral protamine Hagedorn (NPH)—made it possible to combine long-acting and rapid-acting insulin.  This advancement allowed many diabetes patients to take a single daily injection.  Soon afterward, a method for prolonging the action of insulin without adding protamine was discovered.  These developments offered new options for the dosing of insulin, but they also extended the reach of insulin patents into the 1970s.

96.     When the animal-based insulin patents finally began to expire, researchers took another step forward in the development of insulin technology.  In the late 1970s, scientists began to produce human insulin through recombinant technology.  By 1982, Eli Lilly brought the first recombinant human insulins— Humulin R (regular) and N (NPH)—to the U.S. marketplace. Around the same time, Novo and Nordisk developed methods for chemically converting bovine insulin into human insulin.  In 1988, a year prior to merging, Novo and Nordisk obtained approval

---

[30]     Nordisk and Novo merged in 1989 to form Novo Nordisk.

[31]     Jeremy A. Greene & Kevin R. Riggs, Why Is There No Generic Insulin? Historical Origins of a Modern Problem, 372 N. Eng. J. Med. 1171, 1172 (2015).

for their own recombinant insulin.  This innovation allowed them to continue shared domination over insulin sales with Eli Lilly.  It also enabled Eli Lilly and Novo Nordisk to spin a fresh web of insulin patents, promising to stretch into the 21st century.

97.     After the introduction of human insulin, an improved understanding of the human genetic code and recombinant technology put a third insulin development within reach.  In the mid-1980s, scientists began to modify the molecular structure of insulin, attempting to improve its physiological effects.  By 1996, Eli Lilly had obtained approval for Humalog (generic name, insulin lispro), the first rapid-acting, man-made insulin.  This new type of insulin—known as an analog—allowed for faster absorption times.  Never far behind, Novo Nordisk released its own rapid- acting analog, Novolog (generic name, insulin as part), in 2000.  Four years after that, a third pharmaceutical company, Sanofi, released another rapid-acting analog, Apidra (generic name, insulin glulisine).

98.     The same technological advances that brought about rapid-acting analogs gave rise to long-acting analogs.  In 2000, Sanofi released the first long-acting analog.  This drug was branded as Lantus (generic name, insulin glargine).  Five years later, Novo Nordisk gained approval for its own long-acting analog, Levemir (generic name, insulin detemir).  The first patents on these long-acting analogs expired in June 2014, nearly a century after Banting and Best's first patent application in 1923.

99.     In February 2015, Sanofi launched a higher dosage of insulin glargine, branded as Toujeo (generic name, insulin glargine).  In September 2015, Novo Nordisk released a fourth type of long-acting insulin called Tresiba (generic name, insulin degludec).  In December 2016, Eli

Lilly released its own version of insulin glargine, branded as Basaglar (generic name, insulin glargine). Basaglar is a follow-on product to Lantus.[32]

100.    In September 2017, Novo Nordisk released a fourth rapid-acting insulin called Fiasp (generic name, insulin aspart). Fiasp is a slightly modified version of Novolog. Table 2 summarizes the current insulin treatment landscape.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Table 2: Insulin Available in the United States** | | | | | | |
| **Insulin Type** | *Action* | *Brand Name* | *Generic* | *Company* | *FDA Approval* | *List Price in 2019 (WAC)* |
| *Human* | **Rapid-acting** | Humulin R | Insulin Regular | Eli Lilly | 1982 | $148.70 (vial[33]) |
| | | Novolin R | Insulin Regular Novo | Nordisk | 1991 | $137.70 (vial[34]) |
| | **Intermediate** | Humulin N | Insulin Suspension Isophane (NPH) | Eli Lilly | 1982 | $148.70 (vial[35]) |
| | | Novolin N | Insulin Suspension Isophane (NPH) | Novo Nordisk | 1991 | $137.70 (vial[36]) |

---

[32]    It is not considered a generic drug because it did not rely on the Food, Drug, and Cosmetic Act's (FDCA) Abbreviated New Drug Application pathway—the normal pathway to generic entry—for approval. Instead, Basaglar was approved through a different FDCA pathway as a follow-on medication.

[33]    Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[34]    Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[35]    Humulin N 100unit/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

[36]    Novolin N 100units/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

| Analogs | Rapid-Acting | Humalog | Lispro | Eli Lilly | 1996 | $530.40 (pen[37]) $510.45 (vial[38]) |
|---|---|---|---|---|---|---|
| | | Novolog | Aspart | Novo Nordisk | 2000 | $558.83 (pen[39]) $289.36 (vial[40]) |
| Insulin Type | Action | Brand Name | Generic Name | Company | FDA Approval | List Price in 2019 (WAC) |
| | | Apidra | Glulisine | Sanofi | 2004 | $651.76 (pen[41]) $337.39 (vial[42]) |

| Table 2: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Insulin Type | Action | Brand Name | Generic Name | Company | FDA Approval | List Price in 2019 (WAC) |

---

[37]     Humalog KwikPen 100unit/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Lispro 100U/1mL, Solution for injection) (2017).

[38]     Humalog 100unit/ml Cartridge Solution for Injection (box, 5 cartridges, 3 ml Insulin Lispro 100U/1mL, Solution for injection) (2017).

[39]     Novolog FlexPen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[40]     Novolog 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[41]     Apidra SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glulisine 100U/1mL, Solution for injection) (2018).

[42]     Apidra 100unit/ml Solution for Injection (vial, 10 ml Insulin Glulisine 100U/1mL, Solution for injection) (2018)

| | | Fiasp | Aspart | Novo Nordisk | 2017 | $558.83 (pen[43]) $289.36 (vial[44]) |
| | **Long-Acting** | Lantus | Glargine | Sanofi | 2000 | $425.31 (pen[45]) $283.56 (vial[46]) |
| | | Levemir | Detemir | Novo Nordisk | 2005 | $462.21 (FlexTouch[47]) $308.14 |
| | | Basaglar | Glargine | Eli Lilly | 2016 | $326.36 (pen[49]) |

| Table 2: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| **Insulin Type** | *Action* | *Brand Name* | *Generic Name* | *Company* | *FDA Approval* | *List Price in 2019 (WAC)* |
| | | Toujeo | Glargine | Sanofi | 2015 | $647.87 (pen[50]) |

---

[43]    Fiasp FlexPen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[44]    Fiasp 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[45]    Lantus SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection) (2018).

[46]    Lantus 100units/mL Solution for Injection (vial, 10 ml Insulin Glargine 100U/1mL, Solution for injection) (2018).

[47]    Levemir FlexTouch 100units/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection) (2016).

[48]    Levemir 100units/ml Solution for Injection (vial, 10 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection) (2018).

[49]    Basaglar KwikPen 100units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection) (2017).

[50]    Toujeo SoloStar 300units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 1.5 ml Insulin Glargine 300U/1mL, Solution for injection) (2018).

| | | Tresiba | Insulin | Novo Norodisk | 2016 | $610.11 (pen[51]) |
|---|---|---|---|---|---|---|

### C.    Current Insulin Treatment Landscape

101.    Today, analogs dominate insulin sales.  Doctors and patients prefer analogs because they more closely mimic the way the human body naturally absorbs insulin released by the pancreas.  As a result, it can be used in more flexible ways.

102.    The American Diabetes Association—the organization responsible for setting guidelines for diabetes care in the United States—recommends analogs for treatment of individuals with both type 1 and type 2 diabetes.

103.    For type 1 patients, insulin analogs are unquestionably the best course of treatment. Doctors uniformly prescribe analogs for type 1 patients.

104.    For patients with type 2 diabetes, the American Diabetes Association describes long-acting analog insulin as the "most convenient initial insulin regimen."[52] Nonetheless, the organization notes that type 2 patients without a history of hypoglycemia (a condition caused by a drop in blood sugar level) can safely use cheaper, human insulins.

105.    But doctors still prefer to prescribe the Analog Insulins to type 2 patients.  A recent study found that as of 2010, among adults who filled prescriptions for more than one brand of insulin, 91.5% filled prescriptions for insulin analogs.  The study found that percentage has grown considerably since 2000, when only 14.8% of patients (who filled more than one prescription for insulin) filled prescriptions for analog insulin.  Now, type 2 patients use human insulin less

---

[51]    Tresiba Insulin Degludec 200units/mL Pre-Filled Pen Solution for Injection (box, 3 pens, 3 ml Insulin Glargine 200U/1mL, Solution for injection) (2018).

[52]    American Diabetes Association, *Approaches to Glycemic Care*, 38 Diabetes Care S52, S57 (2016), http://care.diabetesjournals.org/content/39/Supplement_1/
S52?ijkey=07291605370b0a3e07418e06fb5e894fb4314f05&keytype2=tf_ipsecsh.

frequently: the study found that only 14.8% of type 2 adults taking insulin filled a prescription for human insulin in 2010, down from 96.4% in 2000.

**Figure 8: Type of insulin used among U.S. adults with type 2 diabetes (who filled more than one prescription)[53]**



106.    In 2016, the top three selling insulins were all analogs: Sanofi's long-acting Lantus garnered $6.98 billion in sales; Novo Nordisk's long-acting Novolog: $3.03 billion; and Eli Lilly's rapid-acting Humalog: $2.84 billion.

---

[53]    Kasia Lipska, et al., Use and Out-of-Pocket Costs of Insulin for Type 2 Diabetes Mellitus from 2000 to 2010, 311 J. Am. Med. Ass'n 2331, 2332 (2014).

### D.    Climbing Insulin List Prices

107.    Despite the availability of many highly effective insulins, too many people living with diabetes go without proper treatment for a familiar reason: cost.

108.    Eli Lilly raised the list prices of Humalog to $530.40 for a package of pens and $510.45 for a box of cartridges by the end of 2017.  Eli Lilly also raised the list prices of Basaglar to $326.36 for a package of pens by the end of 2017.  Figure 9 demonstrates Eli Lilly's price increases from 2006 to 2019 for Humalog, and Figure 10 illustrates Eli Lilly's price increases for Basaglar.

**Figure 9: Rising list prices of Humalog vials and pens from 2008-2021**



**Figure 10: Rising list prices of Basaglar pens from 2016-2021**



109.    Novo Nordisk's list prices for Levemir were $403.50 for a package of pens at the end of 2017 and $293.75 for a vial at the end of 2018. Novo Nordisk's list prices for Novolog sat at $558.83 for a package of pens and $289.36 for a vial at the end of 2018. Novo Nordisk's list prices for Fiasp also sat at $558.83 for a package of pens and $289.36 for a vial at the end of 2018. Novo Nordisk's list price for Tresiba was $484.68 for a package of pens at the end of 2018. Most diabetes patients need at least one package of insulin per month. Figures 11 and 12 demonstrate Novo Nordisk's price increases from 2006 to 2019 for Levemir and Novolog. And Figures 13 and 14 show Novo Nordisk's list price increases for Tresiba and Fiasp.

**Figure 11: Rising list prices of Levemir vials and pens from 2006-2021**



**Figure 12: Rising list prices of Novolog vials and pens from 2006-2021**



**Figure 13: Rising list prices of Tresiba pens from 2015-2021**



**Figure 14: Rising list prices of Fiasp pens from 2017-2021**



110. Sanofi's list prices for Lantus, the top-selling analog insulin, sat at $404.29 for a package of pens and $269.54 for a vial at the end of 2018. Sanofi's list prices for Apidra were $521.41 for a package of pens and $269.91 for a vial at the end of 2018. Sanofi's list price for Toujeo was $620.57 for a package of Toujeo pens at the end of 2018. Figures 15 and 16 demonstrate Sanofi's price increases from 2006 to 2019 for Lantus and Apidra vial and pen packages. Figure 17 demonstrates Sanofi's list prices increases for Toujeo.

**Figure 15: Rising list prices of Lantus vials and pens from 2006-2021**

**Figure 16: Rising list prices of Apridra vials and pens from 2006-2021**



**Figure 17: Rising list prices of Toujeo pens from 2015-2021**



111.     The list prices of Analog Insulins have not always been so high.  In just the last five years, Sanofi and Novo Nordisk have raised Lantus's and Levemir's reported prices an astounding 168% and 169%, respectively.  In fact, in 2016, Novo Nordisk and Sanofi were responsible for the highest drug list price increases in the *entire pharmaceutical industry*.  This distinction largely reflected their price hikes for Lantus and Levemir.  Figure 18 shows Eli Lilly, Novo Nordisk, and Sanofi's exponential list price hikes from 2000 to 2015.

**Figure 18: Rising insulin list prices from 2000-2015[54]**



112.    207. Eli Lilly, Novo Nordisk, and Sanofi have not only dramatically increased their insulins' list prices in the last 15 years, they have done so in perfect lock-step.  In thirteen instances since 2009, Sanofi and Novo Nordisk raised the list prices of their long-acting Analog Insulins, Lantus, and Levemir, in tandem, "taking the same price increase down to the decimal point within a few days of each other."[55]  As one healthcare analyst put it: "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you."[56]  Eli Lilly, Novo Nordisk, and Sanofi have engaged in the same lock-step behavior with respect to their rapid-acting Analog Insulins, Humalog, Novolog, and Apidra, respectively.

113.    An example from 2014 demonstrates this behavior and shows how Defendants inflated their list prices in ways that were completely untethered from their insulins' efficacy, value, or production costs. In May 2014, Novo Nordisk's U.S. Pricing Committee (PC) discussed how to respond to Sanofi's recent pricing actions.  Farruq Jafery of Novo Nordisk emailed the rest of the pricing committee, stating "Sanofi took a price increase on Lantus effective today: 16.1%

---

[54]        Rebecca Robbins, *The Insulin Market is Heading for a Shakeup. But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/ 10/14/insulin-prices-generics/.

[55]        Robert Langreth, Hot Drugs Show Sharp Price Hikes in Shadow Market, Bloomberg (May 6, 2015).

[56]        *Id.*

vial and 9.9% pen.  Based on our PC discussion on 5/19/2014, we agreed that the best strategy for Levemir® is to observe the market and maintain list price parity to competitors.  As such, we will be moving forward with a 16.1% increase on Levemir® vial and a 9.9% increase on Levemir FlexPen® and FlexTouch® effective tomorrow 5/31/2014." Novo Nordisk then followed through, matching Sanofi's list price increases precisely, to the tenth of a percent.  And by doing so netted the company approximately $125 million in additional revenue.[57]

114.    Novo Nordisk continued to track Sanofi's pricing actions and responded with incredible speed.  In November 2014, Sanofi again raised the list price of Lantus vials and pens 11.9%; within hours, Novo Nordisk's pricing committee sought (and ultimately received) approval to raise, by 11.9%, the price of Levemir.[58] Rich DeNunzio of Novo Nordisk estimated the increase would generate approximately an additional $25 million in revenue to the company in 2014 (despite the hike being taken at the end of the year).[59]

115.    Figures 19 and 20 demonstrate this shadow pricing behavior with respect to Lantus and Levemir, with the entry of Eli Lilly's Basaglar, Novo Nordisk's Tresiba, and Sanofi's Toujeo noted as well.  Figures 21 and 22 demonstrate this behavior with respect to Novolog, Fiasp, Humalog, and Apidra.

---

[57]    Charles E. Grassley, Ron Wyden, Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug, at 54.

[58]    *Id.* at 55.

[59]    *Id.* at 56.

**Figure 19: Rising list prices of long-acting insulins from 2006-2021**



**Figure 20: Rising Lantus and Levemir list prices from 2001-2015**



**Figure 21: Rising list prices of rapid-acting insulin from 2006-2021**



**Figure 22: Rising Humalog and Novolog list prices from 1996-2016**



E.    **Eli Lilly, Novo Nordisk, and Sanofi Have Sold Increased Spreads to PBMs in Exchange for (or as a Kickback for) Preferred Formulary Status**

116.    In the past, Novo Nordisk maintained that its price increases reflected the "clinical benefit" of its drugs.[60] But Levemir and Novolog are the exact same drugs they were more than 10 years ago—the clinical benefits of these medications have not changed. Where clinical benefit has not changed, it cannot be used to justify a 169% price increase. Therefore, another factor motivates these list price increases.

---

[60]    Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

117.    Research and development costs do not account for these list price increases, as such have been a fraction of revenues.  For example, during the period of 2014-2018, Sanofi reported net sales of $37 billion for its insulin products with R&D costs of $902 million.  In the same time period, Eli Lilly spent $395 million on R&D with $1.4 billion in sales and marketing expenses on revenues of $22.4 billion.

118.    The real reason Eli Lilly, Novo Nordisk, and Sanofi have increased their list prices is because these firms choose to compete based on hidden rebates to PBMs, rather than transparent prices for all.  PBMs control the formularies that determine whether people living with diabetes will purchase Eli Lilly, Novo Nordisk, and Sanofi's Analog Insulins.  The Defendants have realized that they can manipulate the PBMs' formulary choices by artificially inflating their list prices, rather than lowering net prices.

119.    Under pressure to explain its rising list prices, Novo Nordisk admitted to this behavior in a press release.  On November 30, 2016, Novo Nordisk stated:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make . . . News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "list price" increases we've made over the last decade. In other words, a list price increase by **XX percent leads to an automatic XX percent profit** for the drug maker. We believe that is misleading and here's why: As the manufacturer, we do set the "list price" and have full accountability for those increases. However, after we set the list price, we negotiate with the companies that actually pay for the medicines, which we call payers. This is necessary in order for our medicines to stay on their preferred drug list or formulary. The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.[61]

Explaining the company's list price increases, Novo Nordisk directly admitted that it "set[s] list price" with an eye to achieving "preferred" formulary status.

---

[61]    Novo Nordisk Press Release (Nov. 30, 2016), http://press.novonordisk-us.com/leadership-perspectives?item=1.

120.    For over a decade, Novo Nordisk has steeply raised the list prices of Levemir and Novolog while keeping the net prices of these medicines constant. Figures 23 and 24 (included in Novo Nordisk's press release) illustrate this conduct.

**Figure 23: Net versus List Prices of Novolog Vials[62]**



**Figure 24: Net versus List Prices of Novolog FlexPens[63]**



121.    Eli Lilly, too, has admitted that it raises list prices in order to obtain favorable formulary positions: "The reason drugmakers sharply raise list prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."[64]

122.    Sanofi has also conceded its participation in this pricing scheme:

[S]ince 2014, we have increased the level of rebates granted for Lantus® in order to maintain favorable formulary positions with key payers in the US.[65]

123.    Sanofi's manipulation of its spreads is visible in Figure 25.

---

[63]    *Id.* The FlexPen is a type of insulin injection. Patients who use this pen stick themselves with a pen-like insulin distributor instead of injecting insulin through a pump or syringe.

[64]    Denise Roland & Peter Loftus, *Middlemen Fuel Insulin Price Rise*, Wall St. J., Oct. 10, 2016, at B1.

[65]    Sanofi, Annual Report (Form 20-F) (Dec. 31, 2016).

**Figure 25: Net versus List Price of Lantus**



124.    Eli Lilly's, Novo Nordisk's, and Sanofi's spread-increasing behavior is also visible from data on these companies' "rebates" to PBMs and insurers.

125.    The two figures below illustrate Eli Lilly's "rebates" from 2007 to 2014.  Figures 26 and 27 show the amount Eli Lilly has increased its rebates (spreads) from 2007 to 2014.

**Figure 26: Eli Lilly's reported "rebates" as a percentage of U.S. gross sales from 2007-2014**



**Figure 27: Eli Lilly's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014**



*Source: Company data, Credit Suisse estimates*

126.    Novo Nordisk has also greatly increased its spreads.  Figures 28 and 29 show the amount Novo Nordisk has increased its rebates (spreads) from 2007 to 2014.

**Figure 28: Novo Nordisk's reported "rebates" as a percentage of U.S. gross sales from 2007-2014**



*Source: Company data, Credit Suisse estimates*

54

**Figure 29: Novo Nordisk's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014**



Source: Company data, Credit Suisse estimates

127.    Finally, Sanofi has greatly increased its spreads.  Figures 30 and 31 show the amount Sanofi has increased its rebates (spreads) from 2007 to 2014.

**Figure 30: Sanofi's reported "rebates" as a percentage of U.S. gross sales from 2007-2014**

Source: Company data, Credit Suisse estimates

**Figure 31: Sanofi's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014**



Figure 82: **SG&A and Rebates as % of US Gross**

*Source: Company data, Credit Suisse estimates*

128.    The arbitrary and deceptive nature of the Defendants' list prices are underscored by how they price drugs to achieve "parity" when a new product launches.  One would expect when a new insulin hits the market, older insulins would become more affordable as some patients flock to the newer and ostensibly more desirable medicines. But the opposite happens.  Instead, the Defendants *inflate* the price of their older insulin products so that they can launch the newer insulins at higher prices and still ensure that consumers switch to those newer, more expensive insulins.  If the drug makers did not raise the list prices of their older medications, consumers would just stay on those medications rather than making the switch to the new ones.  For example, in 2014, Sanofi aggressively began raising the list price of Lantus to achieve "a single price point

for Lantus . . . believing that it would remove cost as a barrier for switching patients to Toujeo to become the preferred basal insulin."[66]

129.    Sanofi and Novo Nordisk have stretched the spreads on their Analog Insulins to the point where they have become the second and third largest rebators in the entire pharmaceutical industry.

130.    Although the Defendants claim they "need" to inflate their list prices to obtain formulary status, this explanation omits a crucial detail.  Drug companies could compete for formulary status in a manner that would help consumers and health plans: *they could significantly lower list (and net) prices*.  Yet, the Defendants refuse to significantly lower their net prices.

131.    Indeed, upon facing pressure from lawmakers to lower their list prices in recent years, the Defendants analyzed the pros-and-cons of doing so.  Novo Nordisk, for example, lamented not being able to compete without massive rebates, without which it risked losing formulary access for its insulin drugs.[67]

### F.    The Artificial Inflation of List Prices is Unfair, Inefficient, and Harms Plaintiff and Class Members

132.    The inflated list prices have harmed Class members.  As the Defendants' list prices soared further and further away from their net prices, these list prices became so misrepresentative, so untethered from their true average prices, as to be unlawful.

133.    But for their ability to profitably game the PBMs' incentive structure, the Defendants would have competed for the PBMs' business the way competitors do in healthy markets: by lowering the prices.  Such competition would have benefited Plaintiff and Class members, who reimburse pharmacies based on AWP.  But instead of competing on lower prices,

---

[66]    Grassley &Wyden, Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug, at 51.

[67]    Grassley &Wyden, Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug, at 62.

each of the Defendants competed for formulary access by offering larger and larger spreads to the PBMs.

134.    To do so, the Defendants closely guarded their pricing structures and sales figures for the Analog Insulins.  Each of the Defendants kept secret the net prices it offered to the PBMs.

135.    Each Defendant also concealed its fraudulent conduct by signing confidentiality agreements with those in the supply chain that knew the net prices.

136.    Each Defendant concealed that (i) the list prices for Analog Insulins were fraudulently-inflated, (ii) it was manipulating the list prices of its Analog Insulins, (iii) the list prices bore no relationship to the prices paid for, or the pricing structure of, the Analog Insulins, and (iv) the net prices to the PBMs were either held constant or else decreasing.

137.    The Defendants' publication of their list prices, combined with their concealment of the rebates and net prices, deceived Plaintiff and Class members into believing that the Analog Insulins' list prices were reasonably related to the drugs' net prices.

138.    Plaintiff and Class members relied on Defendants' representations regarding the list prices for Analog Insulins and paid for the Analog Insulins based on these inflated list prices to their detriment.  Plaintiff and Class members continue to pay for the Analog Insulins based on their list prices.  Such payments are unfair and unconscionable given the value of these drugs as evidence by their true, net prices.

139.    As a result of Defendants' deceptive, unfair, and unconscionable conduct, Plaintiff and Class members overpaid for their Analog Insulins when they paid for these medications based on their list prices. No other entity in the drug supply chain sets these list prices and no other entity in the supply chain has the ability to change these list prices, on which health plan payment—vis-à-vis pharmacy reimbursements—are directly based. The amount Plaintiff and Class members

have overpaid is the difference between the price paid by Plaintiff for the Analog Insulins and a reasonable approximation of the drugs' net prices.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Continuing Violations Doctrine

140.    The conduct of Defendants central to Plaintiff's claims has not ceased; the pricing scheme remains in effect.  And all of the relevant conduct of Defendants is part of a continuing unlawful practice.  Accordingly, under the continuing violations doctrine, this action is timely because the last act evidencing the continuing practice falls within the applicable limitation periods.

### B.    Fraudulent Concealment Tolling

141.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

### C.    Estoppel

142.    Defendants were under a continuous duty to disclose to Plaintiff and Class members the true character, quality, and nature of the list prices upon which their payments for insulin were based.

143.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLASS ACTION ALLEGATIONS

144.    Plaintiff brings this action on behalf of itself and all others similarly situated under Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), as representative of a Class defined as follows:

All entities in the United States of America and its territories which, for purposes other than resale, paid or reimbursed for all or a portion of the purchase price for Apidra, Basaglar, Fiasp, Humalog, Lantus, Levemir, Novolog, Tresiba, and/or Toujeo from 2014 to present at a price calculated by reference to the Average Wholesale Price ("AWP") and/or Wholesale Acquisition Price ("WAC").

145.    Excluded from the Class are: (i) any such entity that owns or is owned by a PBM that performs services for a health plan or plans other than the putative class entity, (ii) any municipal and/or local government fully self-funded prescription drug plan, (iii) the federal and state governments, (iv) fully insured health plans, i.e., plans for which the insurer bears 100% of the risk for the reimbursement obligations to members; (v) PBMs, (vi) natural persons and (vi) Defendants, their subsidiaries and affiliates.  For purposes of this class definition, "owns or is owned by a PBM" means that at any time during the Class period the entity directly or indirectly owned more than 50% of the outstanding shares of the PBM, or that a PBM directly or indirectly owned more than 50% of the outstanding shares of the entity.  By way of clarity and to the extent not excluded above, the Class includes but is not limited to self-insured non-governmental entities, third-party payors that offer insured plans to private individuals and groups, union health and welfare plans, entities that contract to provide programs for the Federal Employees Health Benefit program, sponsors of plans under Medicare Part D, and Managed Medicaid plan sponsors.  Included in the Class are self-insured non-governmental entities and third-party payors that offer insured plans to private individuals and groups.  Likewise, third-party payors that offer insured plans to government entities including the Federal Employee Program, Managed Medicaid, and Medicare Part D are Class members.

146.    The Class period is tolled to the earliest date of the' initiation of the pricing scheme described herein, wherein the Defendants artificially inflated the list prices of the Analog Insulins.

147.    Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  Hundreds of thousands of prescriptions are written for the Analog

Insulins throughout the United States every week, and these prescriptions are reimbursed by health plans all over the country.

148.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct Defendants—i.e., as a result of Defendants' misconduct, these purchasers reimbursed insulin purchases at artificially inflated prices, and they will continue to do so in the future.

149.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the Class.

150.    Counsel that represents Plaintiff are experienced in the prosecution of class action litigation and have particular experience involving pharmaceutical products.

151.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making overcharge damages with respect to the Class as a whole appropriate.  Such generally-applicable conduct is inherent in Defendants' wrongful conduct.

152.    Questions of law and fact common to the Class include, but are not limited to:

i    Whether Defendants engaged in unfair and/or unconscionable conduct;

ii    Whether Defendants controlled and inflated the list price (WAC) of the Analog Insulins;

iii    Whether Defendants knew that the Class members paid based on the list price (WAC) the Defendants set;

iv    Whether Defendants knew that the increased cost of the Analog Insulins harmed the Class members;

v    Whether the Class members could reasonably avoid purchase of the Analog Insulins they reimbursed;

vi     Whether Defendants took advantage of the Class members' lack of capacity to forgo purchases of the Analog Insulins;

vii     Whether the Defendants competed with one another through rebates to the PBMs, rather than reductions to list prices;

viii     Whether the Defendants engaged in a pattern and practice of paying "rebates" to the PBMs that created substantial spreads between the list and net prices;

ix     Whether the large list-to-net price spreads were intended to induce the PBMs to give the Defendants' Analog Insulins favorable placement on their formularies;

x     Whether the Defendants used artificially inflated list prices as a starting point for negotiating these "rebates" for the Analog Insulins;

xi     Whether each Defendant conspired for the purpose of carrying out this pricing scheme;

xii     Whether Plaintiff and Class members made inflated payments based on the artificial list prices for the Analog Insulins;

xiii     Whether the Defendants copied their competitors' price increases such that all rapid- and long-acting insulins were infected by the pricing scheme;

xiv     Whether Defendants have lacked honesty regarding the justifications and driving forces behind the list price increases for Analog Insulins;

xv     Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud or deceive Plaintiff and Class members;

xvi     Whether Defendants are liable to Plaintiff and Class members for damages, for conduct actionable under the various state consumer protection statutes; and

xvii     Whether Defendants are liable to Plaintiff and Class members for damages flowing from their misconduct.

153.    Plaintiff and members of the Class have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly situated health plans to prosecute their common claims in a single forum simultaneously, efficiently, and without the

unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.  Additionally, Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the Class and require court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rule 23(b)(2).

154.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

155.    Each Defendant concealed that (i) the list prices for Analog Insulins were fraudulently inflated, (ii) it was manipulating the list prices of Analog Insulins, (iii) the list prices bore no relationship to the prices paid for, or the pricing structure of, the Analog Insulins, and (iv) the net prices to the PBMs were either held constant or else decreasing.

156.    Defendants' publication of the list prices for Analog Insulins, combined with their concealment of their net prices, deceived Plaintiff and Class members into believing that the Analog Insulins' list prices were reasonably related to the drugs' net prices.

157.    Plaintiff and the Class relied on the representations regarding their list prices and paid for the Analog Insulins based on these inflated list prices to their detriment.  Plaintiff and the

Class continue to pay for the Analog Insulins based on their list prices. Such payments are unfair and unconscionable given the value of these drugs as evidence by their true, net prices.

158.     As a result of Defendants' deceptive, unfair, and unconscionable conduct, Plaintiff and Class members overpaid when covering member analog insulin purchases based on their list prices. No other entity in the drug supply chain sets these list prices and no other entity in the supply chain has the ability to change these list prices, on which health plan payments for insulin are directly based. The amount Plaintiff and Class members have overpaid is the difference between the price paid by Plaintiff for the Analog Insulins and a reasonable approximation of the drugs' net prices.

## VIII.   CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### ("NJCFA")
### N.J. STAT. ANN. §56:8-1, *et seq*.
### (Against Novo Nordisk and Sanofi on behalf of a Nationwide Class)

159.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

160.     Novo Nordisk is a corporation with its headquarters in Plainsboro, New Jersey. Sanofi is a corporation with its headquarters in Bridgewater, New Jersey. New Jersey "has a powerful incentive to ensure that local merchants deal fairly with citizens of other states and countries"[68] and a "strong interest 'in regulating its domestic businesses and in deterring fraudulent business practices.'"[69] Furthermore, New Jersey has some of the "strongest consumer protection

---

[68]    *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[69]    *Kalow & Springut LLP v. Commence Corp.*, 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

laws in the nation."[70]  Therefore, although other states may have some interest in protecting their own consumers, that interest is not frustrated by the application of New Jersey's law. "If a strong state policy or interest will [not be] frustrated by the failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[71]

161.    Plaintiff seeks in this Count, a nationwide class applying New Jersey law to the claims against Novo Nordisk and Sanofi.

162.    In addition to prohibiting fraudulent and deceptive conduct, the NJCFA prohibits unfair or unconscionable conduct.

163.    Unconscionability "is an amorphous concept obviously designed to establish a broad business ethic.  The standard of conduct that the term 'unconscionable' implies is a lack of good faith, honesty in fact and observance of fair dealing."[72]  Unconscionable practices include performance of an agreement, in addition to inducing a purchase.[73]  Charging a price far in excess of the seller's costs, combined with taking advantage of an unfair situation, is an unconscionable practice contrary to the NJCFA.[74]

164.    As the Third Circuit recently recognized, "unfair" and "unconscionable" business practices are "a category of business practices entirely separate from practices that are fraudulent,

---

[70]      *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15 (1994).

[71]      *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the NJCFA).

[72]      *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 543-44 (1971)).

[73]      *Pollitt v. DRS Towing LLC*, No. 10-1285 (AET), 2011 WL 1466378, at *7 (D.N.J. April 18, 2011) (citing *New Mea Constr. Corp. v. Harper*, 203 N.J. Super. 486, 501 (App. Div. 1985)).

[74]      *Kugler v. Romain*, 58 N.J. 522, 542-45 (1971); *In re Nat'l Credit Mgt. Grp., LLC*, 21 F. Supp. 2d 424, 452-53 (D.N.J. 1998); *In re Fleet*, 95 B.R. 319, 336 (E.D. Pa. 1989); *Pro v. Hertz Equip. Rental*, 2012 WL 12906183 (D.N.J. June 25, 2012).

deceptive, or misleading" prohibited under the NJCFA.[75]  The NJCFA "prohibit[s] business practices that are 'unfair' or 'unconscionable' in addition to practices that are fraudulent, deceptive, or misleading; these terms are defined separately and differently in the text of the statutes and in relevant case law interpreting them."[76]

165.    As is set forth above, the prices Plaintiff and Class members reimburse for Analog Insulins, based on their list prices, have been skyrocketing.  This overpayment is a result of Novo Nordisk's and Sanofi's obtaining preferred formulary positions by charging larger list prices and offering larger spreads to PBMs.

166.    The Analog Insulins sold by Novo Nordisk and Sanofi have not changed since they entered the marketplace in the 1990s and 2000s.  These Analog Insulins are no more effective and provide no more benefit than they did decades ago.  Nonetheless, Novo Nordisk and Sanofi have exponentially increased their list prices.

167.    There is no economic or technological reason why Analog Insulins would have become more expensive to produce during the period outlined above.  Indeed, with technological advances and economies of scale, the per-unit cost of Analog Insulin should have gone down during the same period that Novo Nordisk and Sanofi were drastically raising prices.

168.    Novo Nordisk and Sanofi were able to raise the list prices of insulin because health plans who cover patients living with diabetes literally have no choice but to purchase the prescribed Analog Insulins.  If they do not, plan members will die, and Novo Nordisk and Sanofi know it.  Even cutting back on analog insulins to save money, as is described above, can lead to serious health consequences.

---

[75]    *Cottrell v. Alcon Labs.*, 874 F.3d 154, 165 (3d Cir. 2017).

[76]    *Id.* (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (explaining that an unconscionable practice can qualify as unlawful under the NJCFA, "even if no person was in fact misled or deceived thereby").

169.    These actions are made even more unfair and unconscionable by the fact that the rate of diabetes is rising in the United States, allowing Novo Nordisk and Sanofi to take advantage of more people.  Moreover, Novo Nordisk and Sanofi know that the other has not and will not compete based on real reductions in net price; each prefers to compete on inflation of list prices. Even in the absence of collusion, it is in each of Novo Nordisk's and Sanofi's individual best interest not to compete on net price reductions because doing so would lead to a price war which would upset the unconscionable profits earned by all three.

170.    Plaintiff, on behalf of the Class, therefore alleges that Novo Nordisk and Sanofi, in violation of N.J. Stat. Ann. §56:8-2, have engaged in an unconscionable commercial practice in connection with their sale and pricing of the Analog Insulins.

171.    Plaintiff and other Class members have suffered ascertainable losses as a result of Novo Nordisk and Sanofi's unfair and unconscionable act complained of herein. Under N.J. Stat. Ann. §56:8-19, they are entitled to relief in the amount of Novo Nordisk's and Sanofi's overcharges: the difference between the list prices for their Analog Insulins and a reasonable approximation of their net prices.  Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act."[77]  Furthermore, "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[78]  Therefore,

---

[77]    N.J. Stat. Ann. §56:8-19.

[78]    *Id.*

Plaintiff is entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. §56:8-19, and any other just and appropriate relief.

**COUNT II**
**VIOLATION OF THE COLORADO CONSUMER PROTECTION**
**("COLORADO CPA")**
**COLO. REV. STAT. §6-1-101, *et seq.***
**(Against All Defendants)**

172.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

173.    The Colorado CPA prohibits deceptive practices in the course of a person's business including, but not limited to: "Advertis[ing] goods, services, or property with intent not to sell them as advertised"; "Mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions"; and "Fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."[79]

174.    Each Defendant is a "person" under Colo. Rev. Stat. §6-1-102(6).

175.    Plaintiff and Class members are "consumers" for purposes of Colo. Rev. Stat. §6-1-113(1)(a).

176.    Each Defendant's conduct, as set forth above, occurred in the conduct or trade or commerce.

177.    As alleged in this Complaint, Defendants' conduct with respect to the Analog Insulins constitutes: "Advertis[ing] goods, services, or property with intent not to sell them as

---

[79]      Colo. Rev. Stat. §6-1-105(1).

advertised"; "Mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions"; and "Fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction"[80] in violation of the Colorado CPA.

178.    Under Colo. Rev. Stat. §6-1-113, Plaintiff seeks monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages and (b) statutory damages in the amount of $500 for each Plaintiff or Class member.

179.    Plaintiff also seeks an order enjoining each Defendant's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

### COUNT III
### VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
### ("DELAWARE CFA")
### DEL. CODE TIT. 6, §2513, *et seq*.
### (Against All Defendants)

180.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

181.    The Delaware CFA prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression

---

[80]     *Id*.

or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."[81]

182.    Each Defendant is a "person" within the meaning of Del. Code tit. 6, §2511(7).

183.    Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

184.    As alleged in this Complaint, Defendants' conduct with respect to the Analog Insulins violated the Delaware CFA.

185.    Plaintiff seeks damages under the Delaware CFA for injury resulting from the direct and natural consequences of each Defendant's unlawful conduct.[82]  Plaintiff also seeks an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

186.    Defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT IV
## VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT ("FUDTPA")
## FLA. STAT. §501.201, *et seq.*
## (Against All Defendants)

187.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

188.    The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."[83]

---

[81]    Del. Code tit. 6, §2513(a).

[82]    *See, e.g., Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980).

[83]    Fla. Stat. §501.204(1).

189.    In outlawing unfair acts or practices, the Florida Legislature adopted the FTC's interpretations of §5(a)(1) of the Federal Trade Commission Act.[84]  The Legislature specifically stated that a violation of FUDTPA "may be based upon . . . [t]he standards of unfairness . . . set forth and interpreted by the Federal Trade Commission or the federal courts."[85]

190.    Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the FUDTPA.

191.    In addition, Defendants' conduct, as described in this Complaint, constitutes "unfair" acts in violation of the FUDTPA.[86]

192.    Plaintiff and Class members are "consumers" within the meaning of Fla. Stat. §501.203(7).

193.    Each Defendant engaged in "trade or commerce" within the meaning of Fla. Stat. §501.203(8).

194.    The Florida Legislature has provided that a person who has suffered a loss as a result of a violation of FUDTPA may recover actual damages, plus attorneys' fees and court costs, all of which Plaintiff seeks in this action. Plaintiff is entitled to recover its actual damages under Fla. Stat. §501.211(2) and attorneys' fees under Fla. Stat. §501.2105(1).

195.    FUDTPA provides that "[a]nyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."[87]  Plaintiff seeks

---

[84]    *Id.* §501.204(2).

[85]    *Id.* §501.203(3)(b).

[86]    *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (defining an "unfair practice" under the FDUTPA as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and noting a separate definition for "deception" (internal quotation marks and citation omitted)).

[87]    Fla. Stat. §501.211(1).

an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the FUDTPA.

## COUNT V
### VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES STATUTE
### Ind. Code Ann. §24-5-0.5-1, *et seq.*
### (Against All Defendants)

196.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

197.    The Indiana Deceptive Consumer Sales statute prohibits a supplier from engaging in "unfair, abusive or deceptive" acts omissions and practices.[88] Such prohibited conduct includes without limitation a representation "[t]hat a specific price advantage exists" as to a consumer transaction "if it does not and the supplier knows or should reasonably know that it does not."[89]

198.    The Plaintiff's and Class members' purchases of Defendants' Analog Insulin are "consumer transactions" as that term is defined in Ind. Code. Ann. § 24-5-0.5-2(1).

199.    Each Defendant is a "supplier" as that term is defined in Ind. Code. Ann. § 24-5-0.5-2(3).

200.    Defendants' conduct, as described in this Complaint, constitutes "unfair, abusive or deceptive" acts in violation of the Indiana Deceptive Consumer Sales statute.

201.    The Indiana Deceptive Consumer Sales statute permits a person who relied on an uncured deceptive act to bring an action for the greater of actual damages and $500. Ind. Code. Ann. § 24-5-0.5-4(a). In the case of willful deceptive acts, the statute permits the Court to award the greater of treble damages and $1000. Pursuant to this provision of the statute, Plaintiff seeks

---

[88]    Ind. Code. Ann. §§ 24-5-0.5-3(a), 24-5-0.5-3(b)(6).

[89]    *Id.*

monetary relief against each Defendant in the amount of actual damages, as well as punitive damages because Defendants each acted willfully.

## COUNT VI
## VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
## ("KENTUCKY CPA")
## Ky. Rev. Stat. §367.220, *et seq.*
## (Against All Defendants)

202.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

203.    The Kentucky CPA prohibits "[u]nfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce."[90]

204.    Plaintiff and Class members are "persons," within the meaning of Ky. Rev. Stat. §367.110(1).

205.    Defendants' conduct, as described in this Complaint, constitutes "[u]nfair, false, misleading or deceptive" acts or practices in violation of the Kentucky CPA.

206.    Under Ky. Rev. Stat. §367.22, Plaintiff seeks monetary relief against each Defendant, punitive damages, reasonable attorney's fees and costs, and injunctive relief.

## COUNT VII
## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
## ("MICHIGAN CPA")
## MICH. COMP. LAWS §445.902, *et seq.*
## (Against All Defendants)

207.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

208.    The Michigan CPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "[m]aking false or misleading

---

[90]    Ky. Rev. Stat. §367.170.

statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."[91]

209.    Plaintiff and Class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

210.    Each Defendant is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws §445.902(1)(d) and (g).

211.    Defendants' conduct, as described in this Complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Michigan CPA.

212.    Plaintiff seeks injunctive against Defendants to prevent their continuing unfair and deceptive acts; monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws §445.911.

213.    Plaintiff also seeks punitive damages because each Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants maliciously and egregiously misrepresented the actual price of their Analog Insulins,

---

[91]    Mich. Comp. Laws §445.903(1).

inflated their list prices, and concealed the reasons for and amount of the rebates offered to the PBMs to increase their profits at the expense of consumers and payors. Defendants manipulated the price of their lifesaving products without regard to the impact of their scheme on consumers' or payors' ability to afford a life-saving product. Defendants' conduct constitutes malice, oppression, and fraud, warranting punitive damages.

**COUNT VIII**
**VIOLATION OF THE NORTH CAROLINA UNFAIR**
**AND DECEPTIVE TRADE PRACTICES ACT**
**("NCUDTPA")**
**N.C. GEN. STAT. §75-1.1,** *et seq.*
**(Against All Defendants)**

214. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

215. The NCUDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."[92]

216. Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the NCUDTPA.

217. In addition, Defendants' conduct, as described in this Complaint, constitutes "unfair" acts in violation of the NCUDTPA.[93]

218. Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. §75-1.1(b).

219. Section 75-16 of the NCUDTPA provides injured persons with a private right of action and automatic trebling of damages: "If any person shall be injured or the business of any

---

[92]    N.C. Gen. Stat. §75-1.1(a).

[93]    *Melton v. Family First Mortg. Corp.*, 576 S.E.2d 365, 368 (2003) ("A practice is unfair [under the NCUDTPA] when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" and offering a separate definition for "deceptive" practices (internal quotation marks and citations omitted)).

person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of Plaintiff and Class members and against Defendants for treble the amount fixed by the verdict."[94]

220.     Plaintiff seeks an order trebling the actual damages to Plaintiff and Class members, an order enjoining Defendants' unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under N.C. Gen. Stat. §75-16.

**COUNT IX**
**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT**
**("OHIO CSPA")**
**OHIO REV. CODE ANN. §1345.01, *et seq.***
**(Against All Defendants)**

221.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

222.     The Ohio CSPA broadly prohibits "unfair or deceptive act[s] or practice[s] in connection with a consumer transaction."[95] Specifically, and without limitation on the broad prohibition, the Ohio CSPA prohibits suppliers from representing that "a specific price advantage exists, if it does not."[96]

223.     Each Defendant is a "supplier" as that term is defined in Ohio Rev. Code Ann. §1345.01(C).

224.     Plaintiff and Class members are "consumers" as that term is defined in Ohio Rev. Code Ann. §1345.01(D).

---

[94]     N.C. Gen. Stat. §75-16.

[95]     Ohio Rev. Code Ann. §1345.02.

[96]     *Id.*

225.    The relevant health plan payments for Analog Insulins are "consumer transaction[s]" within the meaning of Ohio Rev. Code Ann. §1345.01(A).

226.    Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the Ohio CSPA.

227.    In addition, Defendants' conduct, as described in this Complaint, constitutes "unfair" acts in violation of the Ohio CSPA.

228.    As a result of Defendants' wrongful conduct, Plaintiff and Class members have been damaged in an amount to be proven at trial.  It will seek all just and proper remedies, including, but not limited to: actual and statutory damages, an order enjoining Defendants' deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. §1345.09, *et seq.*

## COUNT X
## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### ("Pennsylvania UTPCPL")
### 73 Pa. Stat. §201-1, *et seq.*
### (Against All Defendants)

229.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

230.    The Pennsylvania UTPCPL defines "unfair or deceptive acts or practices" to include the making of "false or misleading statements of fact concerning the reasons for, existence or, or amounts of price reductions."[97]  Such conduct is unlawful.[98]

231.    Each Plaintiff and member of the Class is a person within the meaning of 73 Pa. Stat. §201-2(2).

---

[97]    73 Pa. Stat. §201-2(4)(xi)

[98]    73 Pa. Stat. §201-3(a).

232.    Defendants' conduct, as described in this Complaint, constitutes unfair or deceptive acts or practices under the Pennsylvania UTPCPL.

233.    Plaintiff and Class members are entitled to recover the greater of actual damages or $100 pursuant to 73 Pa. Stat. §201-9.2.  Plaintiff and Class members are also entitled to treble damages, attorneys' fees and injunctive relief under 73 Pa. Stat. §201-9.2.

## COUNT XI
## VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT ("SOUTH CAROLINA UTPA")
### S.C. CODE ANN. §39-5-10, *et seq.*
### (Against All Defendants)

234.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

235.    The South Carolina UTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[99]

236.    Each Defendant is a "person" under S.C. Code Ann. §39-5-10.

237.    Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the South Carolina UTPA.

238.    In addition, Defendants' conduct, as described in this Complaint, constitutes "unfair" acts in violation of the South Carolina UTPA.

239.    Pursuant to S.C. Code Ann. §39-5-140(a), Plaintiff seeks monetary relief to recover their economic losses.  Because Defendants' actions were willful and knowing, Plaintiff's and Class Members' damages should be trebled.

240.    Plaintiff further alleges that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants carried out despicable conduct with willful

---

[99]    S.C. Code Ann. §39-5-20(a).

and conscious disregard of the rights and safety of others. Defendants misrepresented the actual prices of the Analog Insulins, inflated their benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of health plans and consumers. They manipulated the prices of their life-saving products without regard to the impact of their scheme on health plans and their ability to provide benefits to their participants. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

241.    Plaintiff further seeks an order enjoining each Defendant's unfair or deceptive acts or practices.

### COUNT XII
### VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION STATUTE ("South Dakota DTPCP Statute") S.D. Code Laws §37-24-1, *et seq.* (Against All Defendants)

242.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

243.    The South Dakota DTPCP Statute declares it a deceptive act or practice for any person to, *inter alia*, "knowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby."[100]

244.    Defendants' conduct, as described in this Complaint, constitutes misrepresentations to conceal material facts in connection with the sale of merchandise in violation of the South Dakota DTPCP Statute.

---

[100]    S.D. Code Laws § 37-24-6(1).

245.    Pursuant to S.D. Code Laws §37-24-31, Plaintiff seeks monetary relief to recover their economic losses.

### COUNT XIII
### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
### ("TENNESSEE CPA")
### TENN. CODE ANN. § 47-18-101, *et seq.*
### (Against All Defendants)

246.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

247.    Tennessee CPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."[101]

248.    Plaintiff and Class members are "persons" within the meaning of Tenn. Code Ann. §47-18-103(2).

249.    Each Defendant is a "person" within the meaning of Tenn. Code Ann. §47-18-103(2).

250.    Each Defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. §47-18-103(19).

251.    Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the Tennessee CPA.

252.    Pursuant to Tenn. Code Ann. §47-18-109(a), Plaintiff seeks monetary relief against each Defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

---

[101]    Tenn. Code Ann. §47-18-104.

## COUNT XIV
## VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER
## PROTECTION ACT ("Texas DTPCPA")
## Tex. Bus. & Com. Code §17.41, *et seq.*
## (Against All Defendants)

253.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

254.    The Texas DTPCPA makes unlawful "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."[102]  Such false misleading and deceptive acts and practices include without limitation "false or misleading fact[s] concerning the reasons for, existence of, or amount of price reductions."[103]

255.    Defendants' conduct, as described in this Complaint, constitutes false, misleading and deceptive acts, and misleading statements concerning the existence of price reductions in violation of the Texas DTPCPA.

256.    Pursuant to Tex. Bus. & Com. Code §17.50, Plaintiff seeks monetary relief to recover their economic losses.  Because Defendants acted knowingly and intentionally, Plaintiff and members of the Class are entitled to treble damages.  Tex. Bus. & Com. Code §17.50(b)(1). Plaintiff and Class members also seek injunctive relief, *id*., and attorney's fees.  Tex. Bus. & Com. Code §17.50(d).

## COUNT XV
## VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION
## ACT ("West Virginia CCPA")
## W. Va. Code §46A-6-101, *et seq.*
## (Against All Defendants)

---

[102]    Tex. Bus. & Com. Code §17.46(a).

[103]    Tex. Bus. & Com. Code §17.46(b)(11).

257.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

258.    The West Virginia CCPA declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."[104]  Unfair or deceptive acts or practices include without limitation "[m]aking false or misleading statements of fact concerning the reasons for, existence or amounts of price reductions,"[105] and "the concealment, suppression or omission of any material fact with intent that others rely" thereon.[106]

259.    Defendants' conduct, as described in this Complaint, unfair and deceptive acts, misleading statements concerning the existence of price reductions, and the concealment of material facts in violation of the West Virginia CCPA.

Pursuant to W. Va. Code §46A-6-106., Plaintiff seeks monetary relief equal to the greater of actual damages and $200 for each of Defendants' violations of the West Virginia CCPA.

## IX.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully demand that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class;

B.    Enter judgments against Defendants and in favor of Plaintiff and the Class;

---

[104]    W. Va. Code §46A-6-104.

[105]    W. Va. Code §46A-6-103(K).

[106]    W. Va. Code §46A-6-103(L).

C. Award the Class damages (i.e., three times overcharges) in an amount to be determined at trial;

D. Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

E. Enjoin the Defendants from continuing to report artificially inflated list prices that do not approximate their true net prices.

F. Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## X.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of itself and the proposed Class, demand a trial by jury on all issues so triable.

DATED: November 13, 2023                    Respectfully submitted,

                                               */s/ James E. Cecchi*
                                               James E. Cecchi
                                               Donald A. Ecklund
                                               CARELLA, BYRNE, CECCHI,
                                               BRODY &AGNELLO, P.C.
                                               5 Becker Farm Road
                                               Roseland, New Jersey 07068
                                               Phone: (973) 422-5591
                                               jcecchi@carellabyrne.com
                                               decklund@carellabyrne.com

                                               SCOTT+SCOTT ATTORNEYS AT LAW LLP
                                               Joseph P. Guglielmo (pro hac vice forthcoming)
                                               Donald A. Broggi (pro hac vice forthcoming)
                                               230 Park Avenue, 17th Floor
                                               New York, NY 10169
                                               Phone (212) 223-4478
                                               jguglielmo@scott-scott.com
                                               dbroggi@scott-scott.com

                                               HAGENS BERMAN SOBOL SHAPIRO LLP

Steve W. Berman
1301 2nd Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
Hannah W. Brennan
1 Faneuil Hall Sq.
5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
tom@hbsslaw.com
hannahb@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Mark T. Vazquez
455 North Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
markv@hbsslaw.com

ASHER KELLY ATTORNEYS AT LAW
Lyndsey K. Bates (pro hac vice forthcoming)
25800 Northwestern Highway, Suite 1100
Southfield, MI 48075
Phone: (248) 746-2753
lbates@asherkellylaw.com